******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# MONICA PETERS *v.* NUMAN SENMAN
## (AC 40438)

Keller, Prescott and Harper, Js.

*Syllabus*

The plaintiff brought this action seeking joint custody of the parties' minor child. After the trial court rendered judgment granting joint legal custody to the parties and primary physical custody to the defendant, the plaintiff filed a motion for modification of custody. During the pendency of the custody modification proceedings, the plaintiff also filed two motions seeking a declaratory judgment that certain fundamental rights guaranteed by the federal and state constitutions deprived the court of the authority to adjudicate parental custody conflicts under the best interests of the child standard. Thereafter, the court rendered judgment denying in part the plaintiff's motion for modification of custody, dismissing her motions for a declaratory judgment and awarding attorney's fees to the defendant. On the plaintiff's appeal to this court, *held*:

1. The plaintiff's claim that the court violated her fourteenth amendment rights by terminating a portion of certain rights provided to her under the Individuals with Disabilities Education Act (act) (20 U.S.C. § 1400 et seq.) without conducting a fitness hearing was not reviewable, the plaintiff having failed to brief the claim adequately; moreover, even if the issue of federal preemption had been adequately briefed, it would not have any applicability to the precise claim as framed by the plaintiff, as the plaintiff stated in her brief that she was not appealing from the trial court's decision declining to modify the existing order that she has no authority to change the location of the child's schooling, which was the sole basis for her claim under the act.

2. The trial court did not err in dismissing the plaintiff's motions for a declaratory judgment that the court had no authority under the federal and state constitutions to intervene in her long-standing custody disputes with her child's father; the plaintiff's constitutional claims were meritless, as she fundamentally misunderstood when declaratory relief judgment is statutorily available and failed to recognized the difference between unwarranted governmental or third-party actions intruding upon the lives of intact families, as opposed to the obligation of family courts to hear and decide cases brought before them by one parent against the other.

3. The trial court did not err in denying the plaintiff's motion for modification of custody; the court carefully considered and applied the criteria set forth in the applicable statute (§ 46b-56), the court's factual determination that there had not been a change in circumstances warranting an increase in the plaintiff's parental access during the school year or any change in how decisions affecting the child are made was supported by the evidence, and the plaintiff did not explain how she derived her mathematical computations to support her claim that the court miscalculated the number of home to home transitions the child would experience under her proposed orders.

4. The trial court did not err in awarding the defendant $3500 for a portion of his attorney's fees; that court, which considered all of the relevant statutory (§ 46b-62) criteria, as well as the parties' testimony, evidence and an affidavit of legal fees filed by the defendant's counsel, found the amount and hourly rate set forth in the affidavit to be reasonable, and concluded from all the credible evidence that the plaintiff was in a financial position to contribute to a portion of fees incurred by the defendant for the third course of litigation on the same topic concerning the plaintiff's access to the minor child, and the trial court's failure to address the plaintiff's objection to the defendant's request for attorney's fees was harmless error, as the objection failed to address the criteria in § 46b-62.

Argued April 9—officially released October 29, 2019

*Procedural History*

Application for custody of the parties' minor child, and for other relief, brought to the Superior Court in the judicial district of Tolland, where the court, *Suarez, J.*, rendered judgment granting joint legal custody to the parties and primary physical custody to the defendant; thereafter, the matter was referred to the Regional Family Trial Docket at Middletown, where the court, *Hon. Barbara M. Quinn*, judge trial referee, denied in part the plaintiff's amended motion for modification of custody, dismissed the plaintiff's motions for a declaratory judgment and awarded attorney's fees to the defendant, and the plaintiff appealed to this court; thereafter, the court, *Hon. Barbara M. Quinn*, judge trial referee, denied the plaintiff's motion for articulation; subsequently, this court granted the plaintiff's motion for review of the denial of her motion for articulation and ordered the relief requested in part; thereafter, the plaintiff filed an amended appeal. *Affirmed.*

*Monica L. Syzmonik*, self-represented, the appellant (plaintiff).

*Opinion*

KELLER, J. The self-represented plaintiff, Monica L. Peters,[1] appeals from the trial court's decisions denying, in part, her postjudgment amended motion for modification of custody and awarding attorney's fees to the defendant. The plaintiff also challenges the trial court's decision dismissing two motions she filed during the pendency of the custody modification proceedings, in which she sought a declaratory judgment that certain fundamental rights guaranteed by the United States constitution deprived the court of the authority to adjudicate parental custodial conflicts under the best interests of the child standard. On appeal, the plaintiff claims that the court (1) "[violated her] fourteenth amendment and other rights by terminating a portion of her rights under the Individuals with Disabilities Education Act (IDEA) [20 U.S.C. § 1400 et seq.] without conducting a fitness hearing"; (2) erred in concluding that she lacked "standing to request a declaratory judgment to adjudicate her constitutional rights as a fit parent," and violated her right to due process and abused its discretion by not ruling on her motions for declaratory judgment before trial commenced; (3) violated her and her child's rights under the first and fourteenth amendments to the United States constitution by failing to apply the proper balancing test under *Mathews* v. *Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976); (4) erred in awarding attorney's fees to the defendant, Numan Senman; (5) erred in failing to grant her motion for modification of custody; and (6) erred in using its own opinions to infringe on her "fundamental rights to her child," circumvented her due process right to cross examine the judge, and made clearly erroneous findings regarding her proposed orders and the needs of the child. We affirm the judgment of the court.

The following facts, as found by the court, and procedural history are relevant to this appeal. The parties have never been married. The court previously awarded the parties joint legal custody of their minor son (child), and determined that his primary residence would be with the defendant. On October 22, 2015, the plaintiff filed a motion to modify the joint custody orders pertaining to the child, who has autism and was eight years old at the time of filing and ten years old by the time the hearing on the motion occurred. In her motion for modification, the plaintiff sought shared decision making by both parents and primary residence of the child with her because she claimed she resides in a school district better able to provide for his specialized needs. On November 7, 2016, the plaintiff filed an amended motion for modification that included allegations that the prior order as to custody infringed on the constitutional rights she had asserted in prior motions she filed seeking a declaratory ruling. In proposed orders dated February 2, 2017, the defendant noted his objection to

the plaintiff's motions seeking a declaratory judgment and amended motion for modification. He also sought the clarification or removal of certain mediation orders in the original joint custody orders, supervised parental access for the plaintiff due to his concerns about her husband, and attorney's fees.

A trial was held on February 15, 16 and 17, 2017. The court issued its decision on the plaintiff's motions for a declaratory judgment on April 6, 2017. It issued its decision on the plaintiff's motion for modification on April 7, 2017.

In its decision on the motion for modification, the court noted that "[t]he matter of [the child's] primary residence has now been litigated by his never married parents three times since he was four years old. All hearings have been initiated by the plaintiff . . . . The first contested hearing began in late 2010 and ended with a decision on March 22, 2011, that awarded joint custody of [the child] to both parents, and primary residence to [the defendant]. There were orders regarding access, insurance, child support and tax exemptions. [The child's] best interests were found to be with continued stability in [the defendant's] care.

"The second contested evidentiary hearing on the issue of [the child's] residential placement was conducted before Judge Holly Abery-Wetstone. It began with [the] plaintiff's motion seeking both equal decision-making privileges . . . and an equal parenting schedule. [On] October 21, 2013, the relief the plaintiff sought was denied, but changes to the earlier orders were made. Decision making was divided between the parties, with the [defendant] having final authority over issues of physical health, general welfare, extracurricular activities, religious upbringing and choice of school system. The [plaintiff] was awarded final decision-making authority relating to the treatment of [the child's] autism, as she has been a good advocate for him. The orders were clarified to state that she had no authority to change his school [and] provided for a mediation mechanism to resolve disputes. . . .

"As noted, less than three years after the last fully contested hearing, a motion to modify, seeking essentially similar relief has been again filed by the plaintiff . . . ."

The court considered this case as one of "high conflict" since the parties first formed a relationship, a conflict that continued with respect to the child's care due to their very different parenting styles and inability to agree on most issues. "As noted by Judge Abery-Wetstone and apparent during the course of this trial, they have no effective means of coparenting or indeed communicating, largely because they have such differing viewpoints and personalities."

The court found that since the child was approxi-

mately two years old, he had remained without interruption in the defendant's care, with the plaintiff "coming in and out of his life as the parties reconciled or ended their relationship multiple times between 2006 to 2010." The child had resided in a home the defendant purchased since 2009 and had only known the Vernon school system. He is the only child in the defendant's home. The defendant has a flexible work schedule and is able to care for his son largely without assistance. The child has friends in the community and school. According to the defendant, the child is well supported by his individual education plan (IEP) and his teachers, a one-on-one paraprofessional and the defendant, who regularly supervises his school work, and is doing well academically.

The court stated that despite the plaintiff's dissatisfaction with the child's plan for transitioning to middle school in Vernon, "by history and current testimony, routine, stability and predictability of his living situation have been provided to [the child] primarily by [the defendant] for most of this child's life." The court noted that the plaintiff asserted that her changed living circumstances, her marriage and the birth of her daughter by her new husband are all changes in circumstances that supported her quest for a change in the child's primary residence, but considered most of these changes to be personal to the plaintiff and not based on events in the child's life. The plaintiff's two major claims were that her life had changed dramatically since she was last before the court regarding custody and that her son's low test scores were proof that his current school system is inadequate.

The court found the plaintiff's claims as to the unsuitability of his current schooling in Vernon were unsupported by any evidence about what could be expected of the child, in light of his age and special needs as a child with autism. The plaintiff produced no expert testimony, and the court noted that "[o]utcome does not prove causation" because school performance, especially for an autistic child, is only one of a multitude of factors that could have brought about such results. The court also noted that the plaintiff failed to present any evidence that the Glastonbury school system would provide the child with a better education.[2]

The court agreed with the defendant that a change of residence for the child was something that the plaintiff wants for herself to prove she is an adequate parent. It concluded that the plaintiff had an unwillingness to take into account the details of the child's daily life, nor was she able "to provide a nuanced account of [the child] in her demand for a change of his residence. His connections to the [Vernon] community in which he has grown appeared to have no relevance to her, nor the stability that he has had where he now resides. The plaintiff did not appear to carefully consider what might

be best for him, even if it went counter to her own desires."

The court found that the plaintiff believes that because she had not been previously found to be an unfit parent, she is entitled to equal time with and responsibility for the child. The court noted, however, that the plaintiff's lack of fitness or fitness as a parent was not the crux of the issue before the court. "Many children caught up in custody disputes are fortunate to have two fit parents, as these parents each appear to be. But for the court, it is what is in [the child's] best interests that must be considered. Fitness is but one of the many criteria to be considered. As our Supreme Court many years ago concluded . . . '[i]n the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child . . . .' "

The court found fault with both parents, but concluded that the defendant had "been the parent who has most reliably cared for [the child] and rearranged his life to provide for the stability and predictability of care both parents agree [the child] needs. There has been no change in [the defendant's] commitment for many years."

The court noted its concerns about the plaintiff, indicating that "[h]er myopic view of the superior quality of her new family life as the only valid outlook raises questions in the court's mind about what her conduct towards her son might be in the future, should her son reside with her. As he ages, [the child's] own behavior and outlook, which reflect similarities to those of [the defendant], are likely to conflict with those of [the plaintiff]. . . . Also, what would his integration in her family life be like, as it includes a young half-sister, and two older children of her husband who visit from time to time, as well as the plaintiff's new husband? While the plaintiff points to the fact that [the child] enjoys his visit with her and her new family, visits are different from a more permanent residence with reduced access to [the defendant]. Whatever else can be said about it, the court finds that the plaintiff's household is not a quiet household where the focus is only on [the child] with established and clear patterns of daily living."

The court also found that the defendant had some valid concerns about the plaintiff's new husband but declined to order only supervised access by the plaintiff. In assessing the validity of the defendant's concerns, the court took judicial notice of a trial court memorandum of decision in the case of *Szymonik* v. *Szymonik*, Superior Court, judicial district of Hartford, Docket No. FA-06-4027147-S (January 6, 2017). The court noted that that decision, which involved a postdissolution motion for modification filed by the plaintiff's husband regarding his children, recited "concerning conduct and behavior." In particular, the court noted that the deci-

sion "details some questionable parenting on Mr. Syzmonik's part and an appalling lack of sensitivity to his children's emotional needs in his own high-conflict custody case."

Much of the evidence presented at trial reflected the parties' difficulty to reach an agreement concerning issues involving the child, as well as the problems encountered by the parties surrounding their physical exchanges of the child for visits. The court found that in the past, the plaintiff has "been unable to return the child promptly or to pick him up without incident. Those difficulties have lessened since her new husband provides the transportation, although his conduct has also caused some difficulties. Nonetheless, these facts do point to [the] plaintiff's historical issues with routine and predictability. Shifting the responsibility for punctuality to a third party does not address her need to demonstrate that she can provide routine and predictability herself. The plaintiff's proposed plan would increase the physical exchanges of the child between the parents. In formulating her plan, it is apparent that she did not consider how the increased changes in his routine would impact [the child]."

The court added, "[t]hat [the plaintiff] loves and wishes the best for her son is not in question. It is the methods by which she seeks that outcome which rather sharply outline what the court views as her deficits as a parent. The same dismissive and condescending pattern of conduct towards the defendant continues in her attempts to mediate all orders with the defendant, including those which were specifically stated in the decree. She simply would not accept the defendant's refusal to mediate established orders and actively blames him for what she sees as his 'failure.' She cannot appreciate her own failure to proceed in a reasonable manner to resolve disputes. The orders entered in 2013 very explicitly set forth those matters which are to be mediated and those which are ordered, a distinction apparently not clear to the plaintiff."

After considering all the relevant statutory criteria set forth in General Statutes § 46b-56 and the best interests of the child factors as articulated in the case law, the court found that the best interests of "this special needs child" are served by remaining in the primary residential care of the defendant, as previously ordered.

The court denied the plaintiff's motion to modify the child's primary residence and for an equal sharing of time. It also denied the defendant's claim for supervised access by the plaintiff and removed the mediation provisions in the prior court order as unworkable. It further awarded attorney's fees of $3500 to the defendant. Attached to the court's decision was a Schedule A, which contained the court's parental access orders and other various provisions regarding each parties' decision-making authority,[3] including, inter alia, a parenting

schedule, orders pertaining to the child's extracurricular activities, sharing information as to the child, communication and parenting guidelines, and various transportation and relocation orders.

The court also ordered that future motions to modify would not be entertained without leave of the court and unless six coparenting counseling sessions have been completed in good faith by the parties with a provider of their own choosing, although no coparenting sessions were otherwise ordered.

On April 12, 2017, the defendant filed a motion for articulation, which the court granted on April 28, 2017, making a minor change to permit the parties to alternate time with the child during the annual April school spring break. On April 25, 2017, the plaintiff filed a motion for reconsideration of the court's April 6, 2017 decision on her request for a declaratory judgment, which the court summarily denied on April 28, 2017. On April 26, 2017, the plaintiff filed a motion for reconsideration, to vacate and "to uphold constitutional rights." The court denied this motion on April 28, 2017. On May 5, 2017, the plaintiff filed a motion for clarification regarding child support. The court issued a clarification order on May 9, 2017, indicating that any matters concerning child support were never referred to the Regional Family Trial Docket in the judicial district of Middlesex at Middletown for her consideration and any child support matters remained before the Superior Court in the judicial district of Tolland. This appeal followed on May 15, 2017, and was subsequently amended on December 29, 2017.

On September 8, 2017, the plaintiff filed a motion for articulation, which the court summarily denied on October 18, 2017. On October 20, 2017, the plaintiff filed a motion for review with this court. This court, on December 13, 2017, granted review and granted in part the relief requested, ordering the trial court "to articulate the factual and legal basis for its award of $3500 in attorney's fees to the defendant in the April 7, 2017 memorandum of decision and how it calculated that award of attorney's fees." On January 18, 2018, the court issued its articulation. Additional facts will be set forth as necessary.

Before analyzing the claims raised in the present appeal, we set forth our well established standard of review in domestic relations matters. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . .

"In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a

trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Kyle S.* v. *Jayne K.*, 182 Conn. App. 353, 362, 190 A.3d 68 (2018).

"General Statutes § 46b-56 provides trial courts with the statutory authority to modify an order of custody or visitation. When making that determination, however, a court must satisfy two requirements. First, modification of a custody award [must] be based upon either a material change of circumstances which alters the court's finding of the best interests of the child . . . or a finding that the custody order sought to be modified was not based upon the best interests of the child. . . . Second, the court shall consider the best interests of the child, and in doing so may consider several factors. General Statutes § 46b-56 (c)."[4] (Citation omitted; internal quotation marks omitted.) *Harris* v. *Hamilton*, 141 Conn. App. 208, 219, 61 A.3d 542 (2013).

We further note that a trial court's factual findings may be reversed on appeal only if they are clearly erroneous. To the extent that the plaintiff claims that the trial court should have credited certain evidence over other evidence that the court did credit, it is well settled that such matters are exclusively within the province of the trial court. See *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 377, 999 A.2d 721 (2010).

We apply these principles to the present case in our review of the trial court's findings and conclusions with respect to its modification of the custody order. We have thoroughly reviewed the plaintiff's arguments, the history of the case as reflected in the court file and prior decisions, of which the court took notice, the testimony, exhibits,[5] and the court's thorough decisions.

I

The plaintiff's first claim is that the court violated her fourteenth amendment rights by terminating a portion of certain rights provided to her under IDEA without conducting a fitness hearing. We decline to review this claim because it is inadequately briefed.

"Although we are solicitous of the rights of [self-represented] litigants . . . [s]uch a litigant is bound by the same rules . . . and procedure as those qualified to practice law. . . . [W]e are not required to review claims that are inadequately briefed. . . . We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . As this court has observed, [a]ssignments of error which are merely mentioned but not briefed beyond a

statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Wells Fargo Bank, N.A.* v. *Tarzia*, 186 Conn. App. 800, 813, 201 A.3d 511 (2019).

Before addressing the adequacy of the plaintiff's brief with respect to this claim, we note that the issue of the plaintiff's rights under the IDEA was not raised before the trial court until the plaintiff filed a Practice Book §11-11 motion "for reconsideration, motion to vacate, and motion to uphold constitutional rights," after the court issued its memorandum of decision on the motion for modification. In her analysis of the present claim, the plaintiff argues that the court lacked subject matter jurisdiction to make an order that prohibited her from any decision making as to the choice of the child's school because the federal IDEA law preempts the state court from addressing the issue of school choice. In her brief, however, the plaintiff merely makes the bald assertion that the doctrine of federal preemption deprives the family court of subject matter jurisdiction, with no citation to any particular statutory or case-specific authority.[6]

Even if we were to conclude that the issue of federal preemption was adequately briefed, it would not have any applicability to the precise claim as framed by the plaintiff. The plaintiff states in her brief that she is *not* appealing from the court's decision declining to modify the existing order that she has no authority to change the location of the child's schooling, which is the sole basis for her claim that pursuant to federal preemption principles, IDEA has been violated by such a restriction.

Accordingly, we decline to review the plaintiff's claim for being inadequately briefed.

II

In her first, second and third claims, the plaintiff also argues that, under various provisions of the United States and Connecticut constitutions, she is entitled, as a fit parent, to equivalent rights of access and decision making with the defendant and, therefore, the court erred in not declaring this to be so as a matter of law and in not granting her such equivalent rights of access and decision making with respect to the child.[7] We disagree.

In its decision on the plaintiff's two motions for declaratory rulings, the court indicated: "In these motions, the plaintiff seeks to instruct the court on federal constitutional principles which she asserts must be applied in this family case. She further seeks to assert the validity of these principles in the dispute she has with [the defendant]. As our Supreme Court cases have held, this is not the proper application of the declaratory judgment statute or the Practice Book requirements. The procedure is not available to establish abstract principles of law nor to secure advice

on that law. See *Norwalk Teachers' Assn.* v. *Board of Education*, [138 Conn. 269, 272, 83 A.2d 482 (1951)] and *Tellier* v. *Zarnowski*, [157 Conn. 370, 373, 254 A.2d 568 (1969)]. . . .

"Her arguments and legal citations also reflect a significant misunderstanding of the law and the legal consequences of her own actions in seeking relief from this court. All of her arguments and citations refer to circumstances in which a state initiates legal action against an intact family, usually a claim based on child abuse or neglect. This would be a child protection proceeding under the juvenile laws of the state. In such circumstances, absent the abuse or neglect being proven, there is an expectation of privacy and federal constitutional protections are applicable . . . in cases involving the removal of a child from the family unit and placement with third parties.

"The instant case, however, is one in which the state of Connecticut has not initiated any legal action. It is one where the plaintiff herself sought the assistance of the Superior Court . . . in securing orders concerning her child. By so doing, she has voluntarily submitted herself and her family to the jurisdiction of the . . . court and its statutory framework to secure the relief she desires. She has repeatedly litigated her family claims in the family court since 2010. She has been accorded full due process and the right to be heard. She has testified, presented evidence and otherwise taken full advantage of the constitutional protections available to her. . . . Her disappointment in the fact that two previous judges have not seen fit to award her primary physical residence of her son does not invalidate the process, nor require the application of legal principles which belong to another legal arena altogether."

We afford plenary review to the plaintiff's claim. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155, 957 A.2d 407 (2008) (constitutional claims subject to plenary review). We need not undertake an in depth analysis of the claim, however, because we agree with the court that the plaintiff's arguments are based on her fundamental misunderstanding of when and how declaratory judgment relief is available pursuant to General Statutes § 52-29, and her failure to recognize the difference between unwarranted governmental or third-party actions intruding upon the lives of intact families[8] as opposed to the obligation of family courts to hear and decide cases brought before them by one parent against the other.

The original application for custody and the subsequent motions for modification in the present case all were initiated by the plaintiff, yet she argues that the courts have violated her fundamental rights as a parent in intervening to resolve her disputes. In the plaintiff's opinion, conflict between fit parents does not in itself

provide a necessity for state action. In sum, the plaintiff, who has filed an application for custody and two subsequent motions for modification of custody, sought a declaratory judgment from the court ruling that the court had no business intervening in her long-standing custody disputes with her child's father. We consider her constitutional claims meritless, and they warrant no further discussion.[9]

### III

In her fifth and sixth claims, the plaintiff makes the related arguments that the court erred in denying her motion for modification of custody by failing to recognize a material change in circumstances due to "the natural changing needs of the child entering adolescence," upon which the plaintiff does not elaborate; by expressing "baseless" opinions; and by making clearly erroneous mathematical findings regarding the plaintiff's proposed orders and clearly erroneous findings about the child's needs. We have thoroughly reviewed the record and conclude that the court's factual determination that there had not been a change in circumstances warranting an increase in the plaintiff's parental access during the school year[10] or any change in how decisions affecting the child are made is supported by the evidence.

The record reflects that the court carefully considered and applied the criteria set forth in General Statutes § 46b-56, including properly opining on the capacity and disposition of the parents to understand and meet the needs of the child, one of the § 46b-56 criterion. The court's factual findings as to the plaintiff's motivations in seeking a modification[11] and the child's needs as a child with autism were amply supported by the evidence and the reasonable inferences drawn therefrom and are not clearly erroneous. As the court found, the plaintiff's assertions that the Vernon school system and/or the defendant were not properly addressing the child's educational needs were unsupported. The court noted that the plaintiff "provided no information about what could be expected of a child of her son's age and with his special needs as an autistic child" other than to present the court with his test scores with no expert or a more wholesale analysis. When the court stated that the plaintiff "was not able to provide a nuanced account of [the child] in her demand for a change of his residence," it then explained that the plaintiff's "emotional claims to prove herself the 'better' parent" lacked careful consideration of what might be best for the child, even if it went counter to her own desires.

The plaintiff also claims the court "miscalculated the number of home-to-home transitions the child would experience under [her] proposed orders and determined that [the] plaintiff's plan had more home-to-home transitions than what the child already was experiencing," which prejudiced the court's decision. The court,

however, never used the phrase "home-to-home" transitions, but noted "increased changes in [the child's] routine." On the basis of the evidence before the court and in light of the plaintiff's proposed orders, these changes in the child's routine might have included the increased number of times that the child would have had to be transported to and from school in Vernon from Glastonbury, where the plaintiff resides, as well as the increased access afforded to the plaintiff during school vacations. We decline to speculate as to how the plaintiff derived her mathematical computations, and she does not fully explain them, or how the court mathematically derived its conclusion as to increased changes in the child's routine.

Finally, the plaintiff argues that the court had no evidentiary basis to conclude that the child requires a quiet household where the focus is only on him with established and clear patterns of daily living. The court concluded that it was the defendant who consistently had provided the child with such an environment. As previously noted, the court indicated it had reviewed the case file and the child's school records, which included a psychological evaluation of the child.[12] In addition, during his testimony on February 17, 2017, the defendant noted for the court that in an ex parte motion for custody filed by the plaintiff, she herself had admitted the child is easily stressed by sudden changes to his schedule. There also was testimony from both parties that during the first four or five months after the child began visiting the plaintiff and her family in Glastonbury, he exhibited "stimming," self-stimulatory behavior that is a common symptom of autism. Additionally, in his testimony, the defendant observed that, when the child visits the plaintiff, he "just plays in his room by himself."

For the foregoing reasons, we are not persuaded by the plaintiff's claim that the court erred in denying her motion for modification of custody.

IV

The plaintiff's final claim is that the court erred in awarding the defendant $3500 for a portion of his attorney's fees. The plaintiff claims that the court committed plain error by finding that she did not work outside the home when she worked part time, and by finding that the plaintiff elected not to file a financial affidavit or to respond to the defendant's motion for attorney's fees. She argues that as a result of ignoring her financial affidavit and objection to the motion for attorney's fees, the court extrapolated its findings of fact relative to the fee award from the plaintiff's testimony and three photographs of the plaintiff's living room that reflected a "very comfortable lifestyle." We disagree.

On February 15, 2017, the defendant filed proposed orders that included a request that the court award him

attorney's fees. During the hearing of February 17, 2017, counsel for the defendant advised the court of the outstanding issue concerning attorney's fees, and that the parties had agreed to stipulate that the defendant still owed him "approximately $15,000." Whether such a stipulation existed is unclear, as counsel for the plaintiff responded to the representation of the defendant's counsel by stating that "the plaintiff is going to respond as to whether or not she is in agreement that there are outstanding fees." She further indicated that "the plaintiff reserves her right within the context of this case to present her opposition to any outstanding fees."

The court then indicated it would require the parties to present financial affidavits. Counsel for the defendant indicated he would present one to the court before the end of the day, and the file contains a financial affidavit from the defendant dated February 17, 2017.[13] The court later advised counsel for the plaintiff that she could file a written response to the defendant's request for attorney's fees and the plaintiff's financial affidavit within two weeks. On February 23, 2017, the plaintiff filed an objection to the defendant's request, which contained the following assertion with respect to the court's request for the plaintiff's financial affidavit: "Finally, asking for the parties to submit financial affidavits, unrelated to child support, prior to knowing the outcome of the hearing, represents an unwarranted exploratory search. The calculation of income for purposes of addressing attorney's fees is an exploratory search and division of property years after the parties separated, in which [the] plaintiff objects."[14]

On September 8, 2017, the plaintiff filed a motion for articulation to request the legal and factual basis for rulings that were the subject of several of the claims raised on appeal. On October 12, 2017, the court denied her motion. On October 20, 2017, the plaintiff filed a motion for review before this court that included a request that the trial court be ordered to articulate the legal basis and statutory criteria on which it relied in granting attorney's fees to the defendant. On December 13, 2017, this court granted review and granted, in part, the relief requested. Specifically, this court ordered the trial court to articulate "the factual and legal basis for its award of $3500 in attorney's fees to the defendant in the April 7, 2017 memorandum of decision and how it calculated that award of attorney's fees." The trial court subsequently complied with this order.

We begin with our standard of review, as set forth in *Pena* v. *Gladstone*, 168 Conn. App. 141, 148–49, 144 A.3d 1085 (2016). Pursuant to General Statutes § 46b-62,[15] "[i]n dissolution proceedings, the court may order either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in General Statutes § 46b-82 . . . . This includes postdissolution proceed-

ings affecting the custody of minor children. . . . Whether to allow counsel fees, and if so in what amount, calls for the exercise of judicial discretion. . . . An abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did. . . . The court's function in reviewing such discretionary decisions is to determine whether the decision of the trial court was clearly erroneous in view of the evidence and pleadings in the whole record. . . . [J]udicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did. . . . In making those determinations, [this court] allow[s] every reasonable presumption . . . in favor of the correctness of [the trial court's] action. . . . We also note that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . . It is axiomatic that we defer to the trial court's assessment of the credibility of witnesses and the weight to afford their testimony. . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Pena* v. *Gladstone*, supra, 148–49.

The test for an award of attorney's fees pursuant to General Statutes § 46b-62 is not based only on a consideration of whether the party moving for an award of such fees has ample liquid assets. If the prospective recipient of the fee award does not possess such assets, then § 46b-62 requires that the trial court look to and examine the total financial resources of the respective parties and the other criteria set forth in § 46b-82 to determine whether it would be equitable to award attorney's fees under the circumstances. The criteria set forth in § 46b-82 include "the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties . . . ."

In its articulation, the court indicated that it had reviewed an affidavit of legal fees filed by the defendant's attorney, which reflected a billing rate of $245 an hour with fees of $7817.65 incurred as of January, 2017, and an estimate of an additional $7150 in fees to be incurred for a total of $14,976.65 through the conclusion of the trial. The court found the amount and hourly rate to be reasonable. The court stated that it had considered the parties' respective financial abilities and the criteria set forth in § 46b-82 (a).

The court then found that the defendant's affidavit reflects that he earned a gross income of $1400 a week from employment and had a net income of $1000 a week. The court found that the defendant carried many of the regular expenses for the maintenance of the child. It further noted that the testimony revealed that the

plaintiff and her new husband had an approximately one year old daughter. In addition, with her husband's support and payment of expenses, the court found that the plaintiff was able to stay home caring for that child and no longer worked outside the home. The court indicated that the evidence, which included photographs and other information, also reflected that the plaintiff and her husband enjoyed a very comfortable lifestyle[16] and that the plaintiff was able to secure the services of counsel for herself. The court concluded, from all the credible evidence, that the plaintiff was in a financial position to contribute to a portion of the fees incurred by the defendant "for the third course of litigation on the same topic concerning access to her child."

The plaintiff also complains that the court indicated she had not responded to the defendant's request for attorney's fees despite the fact that she filed a written objection to the request approximately two weeks after the contested hearing concluded. In that objection, which was drafted by the plaintiff's attorney, the plaintiff failed to focus on the governing law the court properly applied, § 46b-62, and instead relies on accusations of misconduct on the part of the defendant's attorney and argues that the award of fees would have the effect of penalizing her for seeking to secure her fundamental rights to her child. Because the plaintiff's objection never addressed the relevant criteria in § 46b-62, which nowhere requires a determination whether the plaintiff's motion for modification was filed in good faith, we believe the court's failure to acknowledge her inapposite objection was error, but that, under the circumstances present, it constituted harmless error because it was unlikely to have impacted the result of this case.

We further note that in considering the criteria under § 46b-62, the court is not required to make express findings on each of those statutory criteria. See *Talbot* v. *Talbot*, 148 Conn. App. 279, 292, 85 A.3d 40, cert. denied, 311 Conn. 954, 97 A.3d 984 (2014). On the basis of our review of the full record, we conclude that the court did not abuse its broad discretion in granting the defendant a small portion of his attorney's fees, $3500. The court specifically stated it had considered all the relevant statutory criteria, as well as the parties' testimony, evidence and the defendant's financial affidavit. If the court was unable to consider the plaintiff's financial situation in more detail, the plaintiff has no one to blame but herself because she refused to file a financial affidavit.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff has remarried and is now known as Monica L. Syzmonik. In the trial court, the plaintiff was represented at times by various counsel but also represented herself at other times. She is appearing as a self-represented party for purposes of this appeal. We note that the defendant did not participate in this appeal. This court entered an order on April 25,

2018, providing that this appeal would be considered solely on the basis of the plaintiff's brief and the record, as defined by Practice Book § 60-4, in light of the defendant's failure to comply with this court's April 10, 2018 order requiring him to file a brief on or before April 24, 2018. Accordingly, we have considered this appeal on the basis of the plaintiff's brief, the record, and the plaintiff's oral arguments before this court.

[2] The court indicated it had carefully reviewed a sealed exhibit containing the child's Vernon school records and it presented "a skilled and careful assessment of [the child's] current academic situation and psychological testing and a detailed plan for how to support his continuing needs for support in the classroom."

[3] The court granted final decision-making authority, after good faith consultation with the other parent, to the defendant on issues of physical health, general welfare, extracurricular activities, religious upbringing and choice of school system, and to the plaintiff on matters relating to the treatment of the child's autism. The plaintiff has no authority to change the child's school. These orders are very similar to the previous orders entered by Judge Abery-Wetstone in 2013, except the parties' obligation to mediate certain matters was eliminated.

[4] General Statutes § 46b-56 (c) provides: "In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision."

[5] The clerk's office of the Superior Court for the judicial district of Tolland mistakenly destroyed the exhibits in this case. In accordance with this court's authority to order the trial court to complete the trial court record for the proper presentation of the appeal; see Practice Book § 60-2; on May 7, 2019, this court ordered the trial court "to rectify the record so that copies of the exhibits that were admitted at the trial on February 15, 2017, February 16, 2017 and February 17, 2017 are provided to the Appellate Court on or before July 5, 2019. To assist the trial court in complying with this order, the court may, if it deems necessary, hold a hearing during which it may hear oral arguments, take evidence or receive and approve a stipulation of counsel of record."

On June 6, 2019, this court issued a second order extending the deadline for the trial court's compliance to August 9, 2019. To facilitate the trial court's rectification, this court attached to its order a list describing the sixteen exhibits admitted as full exhibits during the trial proceedings based on our initial review of the trial transcripts.

On June 14, 2019, the trial court held a status conference and issued orders directing the plaintiff to contact her former counsel and the child's school to secure the school records she had previously provided to the court as Exhibits 6 and 13. The plaintiff also was ordered to submit to the court three photographs of her residence that had been admitted as Exhibit 8 and to contact TD Bank, her bank, to obtain a pay activity printout dated January 17, 2017, which had been admitted as Exhibit 12. The defendant was ordered to attempt to find Exhibit A, an e-mail dated February 1, 2017, which had been sent by the plaintiff to the defendant directing him to communicate with her husband about child support, as well as to provide a spreadsheet of child support payments and an e-mail regarding bank records, which had been admitted as Exhibit 14. At the June 14, 2019 status conference, the plaintiff indicated that she would provide copies of the photographs of her son and other children that she previously had submitted.

Despite the willingness to cooperate that she demonstrated to the court at the status conference, in response to the court's orders regarding rectification of the record, on July 18, 2019, the plaintiff filed with this court a "Motion to Vacate Order," claiming, inter alia, that the trial court had exceeded its authority under this court's order, and that it ordered the plaintiff to produce exhibits which the court had "used against her, which may violate her fifth amendment rights," including three photographs of the plaintiff's home, which the court relied on in ordering that the plaintiff pay a portion of the defendant's attorney's fees. On July 19, 2019, we denied the plaintiff's motion to vacate order.

On August 7, 2019, the trial court filed a "Rectification of Record, In Part," indicating that it had attempted to rectify the record, and that, at a status conference on July 19, 2019, the defendant had provided copies of exhibits he had located, including copies of *some* of the plaintiff's exhibits, which the court accepted after review. The court then stated: "The plaintiff contested the jurisdiction of this court to issue its interim orders re rectification after the status conference on June 14, 2019, directing the parties to use their best efforts to complete certain tasks. She did not wish to provide any school records for her son, as she could not now be entirely sure of the content of those records and it might prejudice her case, she claimed. She reported that her attorney had no copies of any exhibits submitted at trial. She failed, without any explanation, to provide any copies of the photographs that she had previously introduced at trial. It is also the case that many of the exhibits concerned themselves with visitation claims and payment of child support, two issues which were not before the court, as the court reminded the parties and counsel at trial. The plaintiff also now asserts that the exhibits in question are not relevant to her present appeal. *It is apparent that she had no interest in supplying any additional copies of missing exhibits.*" (Emphasis added.)

Judge Quinn is correct in indicating in her order that many of the missing exhibits were not relevant to the issues before the court, such as issues concerning visitation and payment of child support. The record, however, suggests that some of the missing exhibits might be relevant to the issues raised on appeal. For example, the plaintiff claims that, after determining that the child would fare better in a quiet and structured setting where all focus would be on him, the court erroneously concluded that the defendant's home as primary residence best met the child's needs. The plaintiff claims there was no evidence to support that determination. Undoubtedly, the psychological report which had been submitted with the school records as Exhibit 13 and reviewed by the court might be quite pertinent to this claim.

Additionally, the plaintiff contests the partial award of attorney's fees to the defendant. In awarding the defendant those fees, the trial court, in determining that the plaintiff had sufficient assets to pay a portion of the defendant's fees under General Statutes § 46b-62, relied, in part, on missing Exhibit 8, which consisted of three photographs of the plaintiff and her family at her residence. In its decision, the court remarked that this exhibit had depicted the plaintiff's "very comfortable lifestyle."

This court consistently has noted that " '[i]t is the responsibility of the appellant to provide an adequate record for review.' " *Federal National Mortgage Assn.* v. *Buhl*, 186 Conn. App. 743, 753, 201 A.3d 485 (2018) (quoting Practice Book § 61-10), cert. denied, 331 Conn. 906, 202 A.3d 1022 (2019). The plaintiff has refused to present the child's school records and the three photographs, which had been admitted as Exhibits 6, 8 and 13, respectively, based, in part, on her position that these exhibits would now prejudice her on appeal. Thus, it is reasonable for this court to assume that those missing exhibits support the trial court's factual determinations that the child

requires a structured, quiet setting with singular focus on his needs and that the plaintiff has a "very comfortable lifestyle."

As we have observed, the trial court in part was able to rectify the record. Furthermore, as the trial court noted, many of the missing exhibits were not directly related to the issues before it. On the basis of the exhibits that the parties provided to the court in connection with its efforts to rectify the record as well as the detailed discussion of many of the remaining missing exhibits at trial, as recorded in the transcript, particularly with respect to email exchanges between the parties, we conclude that the absence of the missing exhibits is not fatal to our ability to review the claims raised on appeal or affect the outcome of the appeal. See *Finch* v. *Earl*, 104 Conn. App. 515, 519, n.5, 935 A.2d 172 (2007) (reasoning that, despite missing exhibits, record provided adequate basis for appellate court to review claims raised on appeal), and cases cited therein.

[6] Moreover, the Second Circuit Court of Appeals has held that IDEA leaves intact a state's authority to determine who may make educational decisions on behalf of a child, so long as the state does so in a manner consistent with federal statutes. The court stated that "allocation of parental rights under the IDEA is best left to local domestic law." *Taylor* v. *Vermont Dept. of Education*, 313 F.3d 768, 780 (2d Cir. 2002).

[7] The plaintiff avoids explaining how such absolutely equivalent rights to access and decision making are workable or how they may affect the child when, as the court noted in the present case, "these parents have had a volatile and unstable relationship full of high conflict since they first formed a relationship. Now, years after their on-again and off-again relationship ended, their conflict continues with respect to [the child] and his care. What is apparent is that they have very different parenting styles and do not agree on most things; in particular those matters relating to [the child]."

[8] Among other authorities, the plaintiff relies on cases that involved constitutional challenges to third-party visitation statutes. See *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), and *Roth* v. *Weston*, 259 Conn. 202, 789 A.2d 431 (2002).

[9] In her brief, the plaintiff discusses, with little reference to controlling authority, some, but not all, of the constitutional claims she presented to the court in her pretrial motions for a declaratory judgment, which the court denied on April 6, 2017. These claims essentially discuss why the use of the best interest standard in custody proceedings constitutes a denial of (1) her first amendment right of free family association between parent and child for purposes of intimate and expressive communication and her right to associate or disassociate a private romantic relationship; (2) her rights under the fourteenth amendment and article first, § 20 of the Connecticut constitution to the same protections as married persons in regard to questionable governmental actions, which include custody proceedings when both parents are "fit"; and (3) her first amendment right to convey religious ideas through free speech and to teach her child religious beliefs.

[10] As the plaintiff acknowledges, the court modified the parental access orders to provide the plaintiff with access to her son for fifteen additional days during the summer vacation.

[11] Contrary to the plaintiff's assertion, "motivation necessarily involves a question of fact to be resolved by a [factfinder]." (Citation omitted.) *Cotto* v. *United Technologies Corp.*, 251 Conn. 1, 47, 738 A.2d 623 (1999).

[12] See footnote 5 of this opinion.

[13] Although the box for "plaintiff" is checked on this affidavit, it is signed by the defendant and notarized by the defendant's attorney, so we are certain this is the defendant's affidavit.

[14] Although the plaintiff claims that the court failed to consider her financial affidavit, the language of her objection to the defendant's request for attorney's fees undermines that contention. In addition, we have thoroughly searched the record and, although it reflects that the defendant submitted a financial affidavit in connection with the February, 2017, hearing, the plaintiff failed to submit a financial affidavit at or near the time of the hearing. As such, her claim that the court erroneously found she did not work outside the home, when in fact, she claims that she works on a part-time basis as an "abdominal therapist," is the result of her own deliberate failure to present the court with evidence to support her version of the facts. Additionally, although she testified that her office hours were approximately ten hours a week, we observe that the plaintiff's office hours do not necessarily support a finding that she generates income during her office hours. Additionally, we observe that the plaintiff also indicated that she had "drastically" reduced her employment since her daughter's birth. Moreover,

even if the court had found that the plaintiff was in fact earning some income on her own, it only would have added to the court's assessment of her ability to pay the attorney's fees at issue, and we are not persuaded that such a finding would have changed the court's ultimate decision to award the defendant a portion of his requested fees.

[15] General Statutes § 46b-62 provides, in relevant part: "In any proceeding seeking relief under the provisions of this chapter . . . the court may order either spouse or, if such proceeding concerns the custody, care, education, visitation or support of a minor child, either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ."

[16] See footnote 6 of this opinion.

--------------------------------